First case for argument this morning 18-3704 and 19-2368 Raju Ahmed v. William P. Barr Mr. Little, what's your participation here? Good morning, your honor. I'm on a different case. Well, I'm going to unpin you. We'll get you later. Sounds good, your honor. Mr. Baluchi, go ahead. Good morning, your honors. May it please the court. This is a first for me before the court virtually. I hope it's not a sign of the times to come. Your honor, I represent Mr. Raju Ahmed. He is a Bengali citizen. Your honor, we have filed a petition for review and subsequently also filed a motion to reopen following a motion to hold proceedings in abeyance due to new evidence that was discovered or presented to us. We filed a motion to reopen. The motion to reopen was also dismissed or denied by the board and we are before the court here today. Your honor, first and foremost, I wanted to address the Supreme Court's recent decision which I think is an issue that has been addressed by both parties. I think that Nasrallah v. Barr, that was recently decided, closes the door on whether or not this court has jurisdiction to review factual challenges, particularly in a CAD order. In this particular case, this honorable court does have full jurisdiction to review it. On this particular case, your honor, I'll just give you some brief background. This is a foreign national that was originally admitted to the United States in 2000. He subsequently was convicted of an aggravated sexual battery. Let me just pause for a moment. There was a denial of sua sponte reopening and jurisdiction over that is very doubtful, but I'm not sure you asked us to review that. Your honor, the motion to reopen, if that is what your honor is referring to? Yes, but the denial was both of the motion and also the BIA added it was not doing a sua sponte reopening. We have jurisdiction to review the motion denial, but our case law is quite strong on no jurisdiction over the sua sponte, but I don't think you challenged it. Am I correct? That's correct. I did not challenge the sua sponte, your honor, and your honor, I'm glad that you brought that up. One of the things that I argued in my brief and I wanted to point the court's attention to is if your honor were to look at the decision by the board on the motion to reopen, one of the items that stands out right off the bat is that the board indicates that it has previously held that someone who seeks to reopen proceedings to pursue a discretionary grant of relief, and it is settled that a cap claim is not subject to relief. There is no issue of discretion. I mean, the convention against torture is very clear. It basically says that if there's a finding, article three provides that a signatory nation will not expel, return, or extradite a person to another country where there are substantial grounds for believing that he would be in danger of being subjected to torture. So there is no discretion right then and there. We believe that the board's dismissal or denial of the motion to reopen is erroneous. In this particular case, your honor, the claims that were presented and the evidence that was considered by the court, rather, the board adopts an immigration judge's decision below that all that the court did was basically substantially surgically dissect the language that appears in the State Department's country report in support of a denial of the claim. Various courts have held that even if a person has not suffered past persecution or rather harm, however, if there is credible evidence that that person is going to be tortured in the future, whether it's by threat or otherwise, that can amount to granting that person relief under the convention against torture. In this particular case, and what's really important, your honors already know this, many countries will utilize their legal system, their judiciary, and their structure for purposes of the international viewers to be satisfied that they are taking the steps and the measures necessary to protect a particular group of people. We see that over and over. We see it in reports coming from the State Department for the Russian Federation, for Saudi Arabia, and for multiple different countries. Here, we have a clearly minority Christian group that while they are a minority and the government has implemented steps to protect them, there is no such protection. There isn't at all any kind of that protection over the security and welfare of those people. I don't understand what you mean by protection. If they are investigating, I mean, your client didn't report his incident of abuse. I don't know that we can deal with this in general terms, which seems to be what you are doing. Judge Locher, what I can tell you, your honor, is in this particular case, the State Department gives us a pretty good example in its own report. For example, a lot of the minority groups such as the petitioner have disputed land disputes that have been taken from them by the government, and the government has not adjudicated over a million of these disputes. So it only goes to show you that on the one hand, they are saying that they have established factors and agencies to provide the security and control to criminalize the persecution of anyone that would want to practice his or her own religion, but the reality is that on the one hand, again, it's a window advertisement, so to speak. They are saying that they have done all these things, but everything else in their conduct shows that they are not. And the unadjudicated, over a million unadjudicated disputes that they have before them is yet another example that just because they are displaying that they are showing something, they really are not doing anything. In this particular case, the petitioner is an apostate. In other words, he converted. He was born as a Muslim and was brought up in a family within the faith as taught by Islam, but he converted to Christianity, and that is undisputed. At no time in the record does it show that he was not credible or he was not a member of the Christian faith or he basically assimilates himself to Catholicism. Mr. Berlucci, on that point, I think certainly the immigration judge was very deferential to your client on credibility issues. I think we are not reviewing the credibility issues. I understand that, but I would say that based on the record, the immigration judge is very deferential to your client and finding your client credible on all of those issues. That said, Nasrallah is a deferential substantial evidence standard of review, but does Nasrallah in any way change the presumption that the immigration judge reviewed the entire record? Your Honor, in this particular case and in light of Nasrallah, I will agree with Your Honor. The substantial evidence standard that the court discussed in Nasrallah, really the bottom line in this particular case, and if I were to ask the question whether or not the board findings are conclusive unless a reasonable adjudicator would be compelled to conclude to the contrary, I think that under that particular standard, no, the immigration judge erred, and I think that the board erred in just basically putting a rubber stamp on the immigration judge's decision. The immigration judge's decision, as you indicated, Judge Clark, he did give a great degree of totality of the evidence that's before the court. You know, your citation in Ninth Circuit cases on that point are simply not persuasive. Our law is quite to the contrary, particularly in terms of whether everything has to be written up in an opinion. That's why the presumption Judge Clark refers to is strong in the Eighth Circuit and appears to have been upheld in Nasrallah. Well, Your Honor, and I agree with the status of the law as it is in this jurisdiction. However, when we look at the facts of the case, when you look at the entire record of appeal, and you look at the credibility deference that was given to this particular petitioner, and again, it appears that the judge made up his mind in what he was going to go ahead and conclude and really didn't go beyond really the State Department conclusions. The State Department report that the immigration judge relied so heavily on in his decision when he wrote it quite clearly confirms that this particular petitioner would be subject to torture if he were to return to Bangladesh. I don't understand how you get there. He didn't even report the abuse. We have no idea whether the protections that the Bengali government affords to people who have been physically attacked, abused, or even tortured by private parties, whether that would come into play. We have nothing in this record that I know of on that other than generalities in a State Department report. Your Honor, what we do have, and that's where the motion to reopen would have been helpful had it been granted and the case had been remanded because the letter that was received from the Member of Parliament, and I think that's an issue that should have not been addressed by the Board, but rather the Board should have returned that evidence by remanding the case to the immigration judge to have a clear record before it. In this particular case, the Board of Immigration Appeals just basically, again, went into its own fact finding saying, well, you know what, this evidence is, well, why wasn't it able to be discovered? Why wasn't it presented earlier? Well, in this particular case, we have to look at the surrounding elements that this particular respondent or petitioner is faced with. He's in custody. He's got limited time to present evidence, and unfortunately, when you are in custody, unlike in a criminal case where deference is given to the defendant, in this particular case, it is hastily done. He needs to present his case and unfortunately was unable to produce that evidence. And Your Honor, Judge Olken, based on what you just raised, I think that the proper course of action would have been to grant the motion to reopen, remand it to the immigration judge, and allow the immigration judge to develop the record, including that new evidence that he discovered. Mr. Borlucci, let's assume that that happened, and let's assume that the record was reopened and or we get there. What weight should the judge have given one member of Parliament's letter? Is it like one member of Congress's letter or statement here when it's one among many and it may have political purposes or other purposes than reporting exactly what is factually accurate? In other words, does the immigration judge then have to go on a fact-finding mission to look at other members of Parliament and then survey all the members of Parliament? How much weight would you have the immigration judge give that? Your Honor, in this particular case, again, looking at the administrative regulations and the precedential decisions that we have, is this evidence substantive? I think it is substantive. I think that there is nothing that at this point in time, it's hard to say. Is the government going to present any rebuttal evidence? Again, we'll have to take the evidence. What first-hand knowledge does this member of Parliament have? He's an official in the Uami League. Your Honor, that would be something for the court to... It's like a member of Congress who's a member of the Federalist Society, having a lot of opinions and whatnot. What's the evidentiary value? Your client had from 2006 until 2018 to build this case. To say that, well, he was under detention and he was rushed and so forth just isn't persuasive in this situation, it seems to me. And that is a good point, but when you have an individual that is released and placed under an order of supervision in 2006, and almost, a shadow of a few months, 11 years later, unexplicably or rather without any notice, he is detained, why didn't he file a motion to reopen earlier? Why didn't he try to obtain this evidence? And when you are on an order of supervision, as ICE places thousands of individuals on an order of supervision forever, there was no reason or immediacy for him to proceed in that case when actually that urgent situation came up that he did. And going back, Your Honor, to both Your Honor, Judge Clark and Judge Loken and what you were saying, I think that the immigration judge, having this additional piece of evidence, has to take it into consideration. He's the trier of fact. He's the one that needs to evaluate and give the opportunity for the government to either corroborate or even challenge that evidence. But we cannot discredit and disregard just because a member of parliament has presented evidence that this is an ongoing problem. It's no different than a whistleblower. Should we listen to a whistleblower or not? Should we discredit him because he just so happened nobody else is whistleblowing? This is not a whistleblower per se instance, but Your Honor, this is an instance where a member of parliament is actually stepping up, putting himself at risk, and expressing a voice about the ongoing claims or harm that a lot of the Christians are suffering in Bangladesh. And that's one of the reasons, as a trier of fact, the board should have not undertaken that analysis. But rather, this is not a discretionary grant. The immigration judge needs to have the record again, explore the record, look at the latest country report, and make a determination as such. As Your Honor knows, since then, since that hearing had taken place, many further events have occurred in Bangladesh. And again, this is not something for the board to consider. But rather, it should have remanded it to the immigration judge to do it. And Judge Clark, as you indicated, I think that under the totality of the circumstances, the immigration judge is going to look and evaluate whether or not this is evidence that grant the order of protection under the Convention Against Torture. Thank you, Your Honor. Thank you, counsel. Mr. Holt, for the attorney general. Good morning. May it please the court, John Holt for the attorney general. Justice Thomas, in his dissenting opinion, observed that the majority opinion was a sea change in immigration law. Whether or not that is entirely correct, time will tell. But certainly, it was a sea storm for the government to brief files with this court. We took the position consistent with prior precedents at the bar in 242A2C of life and limited the jurisdiction of the court. We reap our sales today and bring down the argument that the court does not have jurisdiction to review the Catt claim. And as Rolla establishes that, we acknowledge that. So at the outset, we understand this court has jurisdiction to review the Catt claim under the substantial evidence test. The three points that we submit are most appropriate for the court to consider this morning. First, sensitive always to the removability of a person from the United States. We establish in footnote two of our briefs to the court. The petitioner was removable as a criminal alien. And he was an aggravated felon. A petitioner acknowledges that point in his asylum application, his brief to the board, his motion to reopen, and his opening brief to this court. So there's no question the petitioner is a criminal alien. Consistent with Taylor, Smith, and Quarles, I hear the Kansas aggravated burglary statute is substantially corresponds to the generic burglary offense recognized in Taylor. Counsel, I understand the relevance of criminal alien under the Immigration and Nationality Act, but I don't see how significant it is when we're talking about the Convention against Torture right to relief. It doesn't matter whether he's a criminal alien or even under a death sentence. If he's entitled to C.A.T. relief by an international treaty this country has adopted, that's the issue for us. Well, in light of Taylor and Smith and Quarles, there had also been a great movement in the jurisprudence in that regard. We just wanted to reaffirm to the court that he was removable as an aggravated felon. I'll move on if the court is not concerned. If you have authority that says the criminal alien status is relevant to the C.A.T. analysis, fill me in because I'm not aware. I haven't looked at that. No, Your Honor. It's no longer relevant in light of Nasrallah, but it was relevant just to establish his removability and that's why I went there first. I'll move on to the court's concern with regard to the C.A.T. claim. Certainly, after Nasrallah, there's absolutely no question that the review of the C.A.T. claim is substantial evidence. Petitioner in his argument kindly acknowledges that today. Mr. Fidel, in arguing the case before the Supreme Court of the United States, acknowledged that point. So, the court reviews the C.A.T. claim under substantial evidence test. Here, Petitioner, in his argument to the court a few minutes ago, referred to the substantial evidence test with regard to the board. Perhaps I misunderstood him, but it's quite clear on page one of the board's decision that the board reviewed the C.A.T. claim de novo. So, substantial evidence is the standard of review before this court. We would say here that the record does not compel the conclusion that the agency was wrong. Contrary to the assertion of Petitioner, there was a plenary analysis by the board. If you look at page two of the board decision, they make three distinct points and Petitioner in his argument today really doesn't address those particular points that the agency relied on. They just make some additional reports based on the country report. What those three points establish is, first of all, that there was action taken by the government to protect Christians. Secondly, there was no intent ever to torture. And third, that the consequences of anything that happened, for example, enforcement of the blasphemy laws, would not result in a persecution. For example, the last point that I made with regard to enforcement of the blasphemy laws, the board noted that the consequence of enforcement of the blasphemy laws is imprisonment. And then the board noted that while there are unfortunate circumstances in terms of challenging circumstances for imprisonment for blasphemy offenses, still that is not torture. The immigration judge noted at the outside of his C.A.T. analysis that Petitioner was never tortured. As a matter of fact, he was never harmed by the government. What he asserted was that he was kidnapped. And as the judge noted earlier in argument, Petitioner never reported that. And the immigration judge noted that the failure to report belies the merits of his C.A.T. claim. Not only did the board address the blasphemy laws, but the board also addressed the argument of Petitioner that the government failed to protect him. And the board and the immigration judge both noted that the government had done two things. First of all, they had prosecuted criminals that were intolerant of minorities. Secondly, they noted that the government had specifically given protection at religious events for the Christians. And so while the pain and difficulty and challenges of problems with regard to religious intolerance are certainly in that society, those problems don't equate to torture. And then finally, with regard to the landlord eviction, the board again analyzed and noted that here there was absolutely no intent established by the government to inflict pain and torture or emotional injury as a result of enforcement of the eviction law. Well, I suppose here, counsel, I suppose here the willful acquiescent aspect of this principle that's most at play factually. Well, we would submit that there was not acquiescence and the board evaluated all of the circumstances contrary to the assertion of Petitioner that there was a failure to address all of the circumstances. The plenary that I've just referred to, the eviction laws, the failure to provide protection, the intolerance, the failure to prosecute criminals that were really tolerant of persons. And then finally, the enforcement of the blasphemy law. All of these circumstances didn't establish acquiescence by the government. And I would submit that there are some significant aspects of Nezerbala. The consequences will be argued for some time. And but one thing that's very clear, it established the standard of review. And it did that unequivocally. It's substantial evidence that's highly deferential. And we would submit that the standard of review is really controlling. On pages 19 through 24 of our brief, we argued the factual matters relating to Petitioner's argument that he presented culpable claims of law. Again, Petitioner in his brief has submitted the factual assertions that are relevant to the merits of his cast claim. And we would submit that the evidence doesn't compel a conclusion. With regard to the motion to reopen, again, perhaps the pivotal legal principle is that the standard of review before this court is abuse of discretion. May I just acknowledge again, it's a provocative idea. And I come with questions more than answers with regard to the implications of Nezerbala. And how will Nezerbala be applied in the context of a motion to reopen? Assuming for purposes of this argument and for the court's decision, the court has jurisdiction to address the cast claim. So if the cast claim, in terms of a motion to reopen, if the cast claim is presented in terms of a motion to reopen, we would acknowledge that the court has jurisdiction to address the motion to reopen. There may be other relief. And again, the dissenting opinion addresses in terms of relief and other issues that may be implicated by Nezerbala. It's going to go to the motion to reopen, but that's what's before this court. That's what's on your shore. And so the important idea is that the court has jurisdiction to address the denial of the motion to reopen regarding the cast claim. Isn't the point, counsel, that since the Attorney General's regulations treat the cast claim as part of the BIA review process necessarily, the reopening regulation applies, at least until changed by notice and comment rulemaking? Yes, we agree. We agree that you have, in this particular case. Let me be precise. With regard to the cast claim, and again, I think if there were other, if he made an asylum, the court may have a reopening in terms of asylum, but then a criminal alien, the court may not have jurisdiction there. We don't need to go there right now. The important point is this is a cast claim. The motion to reopen is related to cast. You have jurisdiction. It's in your sandbox to decide whether or not the board erred in abuse of discretion. We would submit that the board did not abuse of discretion. The dispositive point, the dispositive point on the motion to reopen is the regulations clearly established under 10.3.2C1 that the petitioner has the burden when you take a second bite or get a second chance to establish you could not have discovered the evidence and the evidence was not reasonably available. That's the dispositive holding with regard to the motion to reopen. On page 28 of the petitioner's brief, the petitioner asserts in a conclusory fashion, this is new evidence not previously available. No argument to explain why there are facts that support that conclusion. We submit that that alone establishes there was not abuse of discretion. But that's not the only ground the board chose, was it? It's not the only ground, but the petitioner has an obligation. I find the would not likely change the result a much more significant alternative. I mean, it's more than just an alternative. It's almost, it's kind of the equivalent of a harmless error ruling. Even if this were procedurally timely, it doesn't have enough substance. You're telling us ignore the substance, go for the procedure. I frankly don't like that choice. Counselor, I have a question in that regard. What was the date of the remarks of the member of parliament? I don't have that specific date of that right in front of me. The reason I ask that is that that would have some bearing upon whether it could have been discovered earlier. That's right. It does, or an explanation of why that particular document was prepared and presented and related to information that was previously unavailable. With regard to the previous question, I think the significant point is that, of course, there's always procedure and merits. We merely, in terms of making the argument that the court went to the procedural defect and did not go to the merits, certainly your point and the board's analysis reflects both. There was a procedural deficiency as well as the evidence that didn't establish that petitioner would prevail. In summary, we submit that the court has jurisdiction over the Cass claim, but the standard of review applies to both of the issues that the evidence does not compel a conclusive conclusion that substantial evidence supports denial of the Cass claim. Secondly, the board did not abuse its discretion in denying the motion to reopen. Unless you have further questions, thank you, your honor. Thank you for understanding. Mr. Holt, I do have a question. There was a 12-year delay between the initial action and then the enforcement of this. A, what's the explanation for that? And B, is there any legal significance to that? How did that affect the merits, if you will, of Mr. Ahmed's claim? There are a lot of factors that would engage and it would be the sorts of conjecture on why that happened and why that happened in this particular case. There's nothing dispositive in the record to establish that this event or these events contributed to that delay. Resources, enforcement consideration, petitioner circumstances, all of those are factors that I do not have an answer for you to assuage any concern you have in terms of that delay. Thank you, your honor. Thank you. Thank you. Your honor, if I may please the court, I know that my time expired when I was on. I'll give you a minute if there's something you think. No, I mean, I think we understand the issue. So unless there's something that comes up from Mr. Holt's argument. I just want to, your honor, and Judge Loken, thank you for granting me leave for one minute. I'll try to keep it below that minute. I believe that my answer, and I apologize if I misunderstood, Judge Clark, your question. However, at the immigration level, the standard is more likely than not. In other words, if it's more likely than not that the person would be tortured, then CAD has to be granted. And I think that it goes to what Judge Loken was arguing is, you know, we can't disregard substance and substance in this particular case is the heart of the case. And the substance of this letter from the member of parliament. Judge Graz, I apologize. It's in the record. And I'll be happy to. The one question that your honor had for me was the date of that letter. And I know that it was subsequent to our taking the PFR. That's the petition for review. I know that for a fact and I'll be happy to inform the court, but I apologize that I don't have that date on the tip of my finger. Yeah, I think just the chronology is important, not the date. And lastly, your honor, and Eddie, what I can't, to the best of my recollection, your honor, that letter originated well after these proceedings. In other words, it wasn't something that originated, you know, years ago and just so, you know, didn't make it into the record of proceedings. And lastly, Judge Loken, one of the questions that your honor asked was, I believe it was yourself or Judge Clark, you know, why 11 years? Why did the government wait for 11 years to execute an order? Well, what I can tell you based on my personal experience over the past 20 plus years is that the government basically, if they have a travel document, they will execute the order. If they have a travel document to execute it, they will. And if they don't execute, the order is clearly nonetheless an aggravated felon, which is consistent to being at the top of their list for enforcement of these orders. It's probably because they feel that this particular case, this person is not a danger. And there is some credence in the background that the local officers may decide that they're not going to pursue it. Is it also possible? Okay, that's sufficient. Sorry, Judge Loken. Thank you, your honor. Well, no, no, no, no apology. The case has been well presented, well briefed and argued, and we will take it under advice.